**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RUTH PHILLIPS,**                                          CASE NO. 5:20 CV 126

     Plaintiff,

     v.                                          JUDGE JAMES R. KNEPP II

**COMMISSIONER OF SOCIAL SECURITY,**
                                          **MEMORANDUM OPINION AND
     Defendant.                          ORDER**

### INTRODUCTION

Plaintiff Ruth Phillips ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 2). The Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). For the reasons stated below, the Court affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in August 2016, alleging a disability onset date of June 1, 2016. (Tr. 561-74). Her claims were denied initially and upon reconsideration. (Tr. 423-24, 455-56). In April and May 2019, an administrative law judge ("ALJ") held two hearings in this matter at which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. *See* Tr. 85-103, 34-83.[1] On July 25, 2019, the ALJ found Plaintiff not disabled in a written decision. (Tr. 11-26). The Appeals Council denied Plaintiff's request for review, making the hearing decision the

---

1. Plaintiff did not arrive in time to testify at her first hearing. *See* Tr. 100-03. She testified at the second hearing *See* Tr. 37-83.

final decision of the Commissioner. (Tr. 1-7); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on January 20, 2020. (Doc. 2).

## FACTUAL BACKGROUND[2]

Personal Background and Testimony

Born in 1965, Plaintiff was 54 years old at the time of the second ALJ hearing. (Tr. 43). She lived alone in a mobile home. (Tr. 44). She rarely drove, but borrowed a car monthly to shop for groceries and otherwise relied on others for rides. *Id.* She made the twenty-five minute drive to the hearing in a borrowed car. *Id.*

Plaintiff was fired from her prior job answering customer service calls in 2016 due to performance limitations caused by irritable bowel syndrome, problems with her hands and arms, cervical spine problems, and pain from arthritis in her tailbone. (Tr. 46-47, 52-53).

Plaintiff testified her neck problems caused arm and hand numbness and weakness; these worsened over time (Tr. 52-53, 55). Physicians told her these problems could become permanent without surgery, and cervical spinal stenosis might be the cause. (Tr. 53, 57-58). She also had carpal tunnel and arthritis in both hands. (Tr. 54, 62). When sitting at her last job, her neck ached, using her finger on the mouse caused pain, and she dropped things like files. (Tr. 54).

Plaintiff further described headaches related to her neck and triggered by sound or light. (Tr. 67). These caused nausea and vomiting if she did not take ibuprofen quickly. *Id.*

Plaintiff had four or five "crunched" discs in her lower back, bilateral sciatica, sacrum pain with walking, and arthritis in her tailbone. (Tr. 59). She had difficulty sitting for long periods – sometimes she had to get up and move around, and sometimes she had to lie down. (Tr. 59).

---

2. Although Plaintiff suffers from both physical and mental impairments, her developed arguments before this Court involve only her physical impairments. *See* Doc. 12. The Court summarizes only the relevant facts.

Plaintiff also described ongoing fatigue and pain. (Tr. 55-56). A trip to the grocery store caused back pain and she could "barely get [her] food put away" before having to lie down for the rest of the day. (Tr. 56). She did other household chores like sweeping and washing dishes, but had to break them up. (Tr. 56-57). She napped for several hours most days. (Tr. 65-66).

Plaintiff suffered from irritable bowel syndrome ("IBS"), which caused constipation and diarrhea; sometimes she could not leave the house because she had to be near a bathroom. (Tr. 58). She also had urinary urgency and frequency issues, using the restroom seven to ten times per day. (Tr. 69). She treated this with surgery in 2018, but needed another due to ongoing problems. (Tr. 70). Plaintiff used three inhalers for asthma and COPD. (Tr. 60).

She experienced medication side effects of dizziness and memory issues. (Tr. 63). Plaintiff fell previously due to balance issues, but never required an emergency room visit. (Tr. 64). Her doctor "mentioned" a cane, but she was hesitant to use one due to hand and wrist weakness. *Id.*

At the time of the May 2019 hearing, Plaintiff was trying to quit smoking so she could undergo cervical spine surgery, but that surgery was not yet scheduled. (Tr. 39-40). She also needed an updated MRI and her physician planned to try physical therapy first. (Tr. 40).

Earlier – in a March 2017 function report – Plaintiff said she often dropped things, could not lift more than a gallon of milk, and had severe chronic fatigue. (Tr. 614). She could not walk 200 feet without stopping to rest, or stand for more than twenty minutes. *Id.* She further needed five to six bathroom breaks per day due to bladder issues and IBS. *Id.* Plaintiff said she could not stand long enough to cook anything on the stove, but instead used the microwave and made sandwiches. (Tr. 616). Her husband did most chores, but she could "[w]ash a few dishes with frequent breaks" and do "light cleaning with frequent breaks". (Tr. 616). She drove short distances and shopped for groceries with assistance. (Tr. 617).

3

<u>Relevant Medical Evidence</u>

Knee x-rays from July 2016 showed mild medial joint space narrowing on the left. (Tr. 759). That same month, Plaintiff told internal medicine physician Allison Early, M.D. that her fibromyalgia was worsening, reporting, *inter alia*, back pain, neck pain, joint pain, and myalgias. (Tr. 974-75). On examination, Plaintiff had normal neck and musculoskeletal range of motion; she had diffuse tenderness to multiple pressure points and joint tenderness, most notable in her knees and first metacarpal. (Tr. 977). She had normal abdominal and pulmonary examinations. *Id.*

At a visit for gastrointestinal issues in August 2016, Plaintiff had a normal abdominal examination (normal bowel sounds, no tenderness, no distension, no guarding), and normal musculoskeletal range of motion. (Tr. 786). At an internal medicine visit the same day, Plaintiff described continued fibromyalgia pain and moderate IBS symptoms. (Tr. 966). Her examination was similar to the prior month, but she had hyperactive bowel sounds. *See* Tr. 967. Later that month, an EMG showed "very mild" carpal tunnel syndrome in Plaintiff's wrists. (Tr. 1129).

At an annual examination in September 2016, Plaintiff said Lyrica helped her fibromyalgia, but made her "a little loopy". (Tr. 960). The physician observed normal neck range of motion, normal pulmonary examination, and unremarkable musculoskeletal examination. (Tr. 963).

In November 2016, Plaintiff told Dr. Early she had knee pain; she said a steroid shot in the right knee two to three months prior provided "great relief" and requested injections in both knees. (Tr. 950). On examination, Plaintiff had normal neck and musculoskeletal range of motion, as well as normal pulmonary and abdominal examinations. (Tr. 953). She had pain with palpation and crepitus in her knee. *Id.* Dr. Early provided steroid injections in both knees. *Id.*

Plaintiff returned to Dr. Early in December, at which time she again had normal neck range of motion, normal pulmonary examination, and normal musculoskeletal range of motion. (Tr. 944). She had normal bowel sounds, but some abdominal tenderness. *Id.*

In January 2017, Plaintiff saw orthopedic physician Benjamin Burkam, M.D. (Tr. 1024-33). He observed tenderness in Plaintiff's knees, but normal range of motion, and decreased range of motion, tenderness, and pain in her cervical spine with decreased strength and sensation in her left hand. (Tr. 1029-30). Dr. Burkam diagnosed bilateral chronic knee pain, primary osteoarthritis of both knees, and chronic patellofemoral pain of both knees; he recommended physical therapy. (Tr. 1031-32). He further diagnosed chronic cervical radiculopathy, left upper extremity numbness, and bilateral hand weakness; he ordered a cervical spine MRI. (Tr. 1031-32). He noted Plaintiff's cervical spine symptoms were "concerning for discogenic impingement that could warrant surgical evaluation." (Tr. 1032). Dr. Burkam wanted to see an updated MRI before determining whether to refer Plaintiff for surgery. *Id.*

The February MRI showed "[m]ild congenital spinal canal narrowing with moderate multilevel discogenic degenerative changes C3, C4-C6, C7 mildly compressing the cord and contributing to a mild-to-moderate spinal canal stenosis slightly more pronounced at four [sic] C5 on the right and C6-C7 diffusely." (Tr. 886). There was no focal disc herniation, but moderate multilevel neural foraminal narrowing. *Id.*

Also in February, Plaintiff returned to Dr. Burkam about her knee pain. (Tr. 1036-43). Her neck range of motion was normal, but she had decreased range of motion and tenderness in her knees. (Tr. 1040-41). She also had tenderness in her left upper arm and decreased sensation and grip in her left hand. (Tr. 1041). Dr. Burkam described Plaintiff's knee symptoms as "relatively stable". (Tr. 1042-43). He referred her to orthopedic surgery for her left upper extremity numbness,

left hand weakness, and cervical spinal stenosis. (Tr. 1043). At a visit with an internal medicine nurse practitioner that month, Plaintiff had no edema on musculoskeletal examination. (Tr. 938).

At an April visit, Dr. Early observed Plaintiff had normal range of motion in her neck, normal musculoskeletal examination (normal range of motion, no edema), and unremarkable pulmonary and abdominal findings. (Tr. 935).

At a consultative psychological examination later that month, Plaintiff said she "makes the bed and cleans up" in the morning, and "[o]ccasionally" cooked, though "[h]er daughter does not want her to do 'everything in the house.'" (Tr. 920). Her hobbies were "reading, gardening, and hiking as she is physically able." *Id.* Plaintiff further described doing her own laundry and performing personal hygiene tasks "on a fairly regular basis." *Id.*

Plaintiff returned to Dr. Early in July to discuss, *inter alia*, her fibromyalgia and musculoskeletal complaints. (Tr. 926). Dr. Early observed normal neck and musculoskeletal range of motion and normal abdominal findings. (Tr. 929). She also found diffuse musculoskeletal tenderness, and a coarse expiratory wheeze on pulmonary examination. (Tr. 929).

In September 2017, Plaintiff saw Marie Kuchynski, M.D., on referral from Dr. Early regarding fibromyalgia. (Tr. 1144-48). She reported progressively worsening, with joint pain, "trouble doing things", and dropping items. (Tr. 1144). Lyrica and Cymbalta helped, but she still had pain. *Id.* On examination, Plaintiff had a normal gait, normal movement of all extremities, normal muscle strength and tone, and normal pulmonary examination. (Tr. 1147). She had eighteen out of eighteen fibromyalgia tender points, and pain in her left knee. *Id.* Dr. Kuchynski diagnosed fibromyalgia, osteoarthritis, and cervical spine arthritis. *Id.*

In October 2017, Plaintiff saw internal medicine physician Michael Nguyen, M.D., for COPD, fibromyalgia, and chronic neck pain. (Tr. 1058). She reported respiratory symptoms for

the prior two weeks. *Id.* She also requested a referral to a spine surgeon for cervical stenosis. *Id.*
Dr. Nguyen wrote Plaintiff "note[d] her neck pain is chronic and that she has been dealing with it
but feels it needs to be looked at more closely." *Id.* Plaintiff had a normal neck and musculoskeletal
range of motion, but cervical spine tenderness radiating down her neck to her shoulders. (Tr. 1062).
She had wheezes but no respiratory distress and her abdominal examination was normal. *Id.*

At a return visit with Dr. Nguyen the following month, Plaintiff reported improved COPD
symptoms. (Tr. 1066). She described muscle spasms from fibromyalgia, with some relief from
muscle relaxers. (Tr. 1067). Plaintiff had normal neck and musculoskeletal range of motion, no
musculoskeletal tenderness, and normal pulmonary and abdominal examinations. (Tr. 1071). Dr.
Nguyen prescribed muscle relaxants for Plaintiff's muscle spasms. (Tr. 1072).

In March 2018, Plaintiff returned to Dr. Nguyen. (Tr. 1074). She said her COPD was fairly
well controlled on medication, but described significant fatigue, as well as "all over muscle aches
and pains", and persistent muscle spasms despite muscle relaxants. *Id.* Dr. Nguyen also wrote
Plaintiff "note[d] history of cervical stenosis which she has not seen any one for and continues to
reschedule appointments", as well as a history of abdominal pain and cramping "that improves
with medication." (Tr. 1075). Dr. Nguyen observed Plaintiff had normal neck range of motion,
normal musculoskeletal range of motion without tenderness, and normal abdominal and
pulmonary examinations. (Tr. 1079-80). Among other things, Dr. Nguyen referred Plaintiff to a
neurosurgeon for her cervical stenosis. *Id.* He noted Plaintiff had sciatica but "no other
neurological deficits at this time". *Id.*

In June 2018, Plaintiff returned to Dr. Kuchynski for follow-up regarding fibromyalgia and
osteoarthritis for the first time since her initial evaluation in September. (Tr. 1137). Plaintiff
described diffuse pain, overwhelming fatigue, and "many other joint/bone issues". *Id.* Dr.

Kuchynski noted Plaintiff had surgery planned for July, but it was "unclear by her description what is being done." *Id.* On examination, Plaintiff had a normal gait, normal movement of all extremities, normal muscle strength and tone, and normal pulmonary examination. (Tr. 1141). She had eighteen out of eighteen fibromyalgia tender points. *Id.*

In January 2019, Plaintiff had a normal neck range of motion, and on musculoskeletal examination had normal range of motion, no edema, and no tenderness. (Tr. 1104). Pulmonary and abdominal examinations were similarly unremarkable. *Id.*

In April 2019, Plaintiff saw Bradley Inkrott, M.D., for evaluation of low back pain, as well as neck and arm pain. (Tr. 1233-45). Plaintiff told Dr. Inkrott she had neck pain with bilateral upper extremity pain and numbness – including difficulty with fine motor tasks – and ongoing balance issues for four years, worsening over the prior two years. (Tr. 1234). On examination, Plaintiff had an antalgic gait, pain to palpation in her lumbar spine, and limited range of motion due to pain. (Tr. 1241-42). She had full motor strength in her legs, with some diminished sensation in her left. (Tr. 1242). Leg reflexes and pulses were normal, and a straight leg raise was negative bilaterally. *Id.* Plaintiff's cervical spine range of motion was limited due to pain, and she had 4/5 to 5/5 motor strength in her arms. *Id.* She had diminished sensation in both arms and hyperactive reflexes (3+) on the right. (Tr. 1243). Both shoulders had full range of motion without pain. *Id.* A lumbar spine x-ray showed disc space narrowing, greatest at L4-L5 and L5-S1, no significant spondylitic changes, and some facet arthropathy. *Id.* A cervical spine x-ray showed overall kyphotic alignment of the cervical spine, focal kyphosis at C3-C4, "a very stiff segment at C2/C3 and from C4 to the remainder of the cervical spine, which certainly causes hypermobility at C3/C4" and "significant spondylotic changes throughout, worse at the lower subaxial segments." (Tr. 1243-44). Based on Plaintiff's "worsening balance issues and . . . physical exam findings", Dr.

Inkrott was "concerned that her spinal cord compression [had] progressed" since her February 2017 MRI. (Tr. 1244). He recommended an MRI and an upper extremity EMG "to differentiate from a peripheral nerve disorder versus cervical radiculopathy." *Id.* He wrote Plaintiff "does understand that, while her low back pain is most concerning for her, I am most concerned with her cervical spine." *Id.* He referred her to pain management and physical therapy for her low back. *Id.*

The June 2019 cervical spine MRI showed "worsening disc degenerative changes" (as compared to the February 2017 MRI) at C3-C4, C4-C5, and C6-C7 "with new central canal stenosis where previously low normal central canal dimensions were observed. (Tr. 1259). It further showed moderate stable central stenosis at C5-C6, and varying degrees of foraminal and lateral recess compromise from C3-C4 through C6-C7. *Id.* Dr. Inkrott recommended posterior-based decompression and fusion in August "given the C3/C4 instability in addition to the severe spinal cord compression at C5/C6 and C6/C7". (Tr. 1250).

*Opinion Evidence*

In April 2017, State agency physician Timothy Budnik, D.O., reviewed Plaintiff's records and opined she could perform light exertional work[3], with restrictions to frequently climbing ramps and stairs, and occasionally stooping, or climbing ladders, ropes, or scaffolds. (Tr. 402). He cited Plaintiff's cervical spine issue for the opined postural restrictions. (Tr. 403).

In August 2017, State agency physician Leanne Bertani, M.D., reviewed Plaintiff's records and opined she could perform light exertional work, with restrictions to frequently stooping,

---

3. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

kneeling, crouching, or climbing ramps and stairs; occasionally crawling; and never climbing ladders, ropes, or scaffolds. (Tr. 434). She again cited Plaintiff's cervical spine issues for the opined postural restrictions. (Tr. 435).

*Evidence After ALJ Decision*

In August 2019, Plaintiff underwent a decompression and fusion surgery on her cervical spine. *See* Doc. 12-1, at 12, 13. The following month, Plaintiff returned for a revision surgery after "imaging results show[ed] proximal junctional failure with C3-C4 junction and C3 loosening of the screws." (Doc. 12-2, at 9).

VE Testimony

The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and RFC as ultimately determined by the ALJ. *See* Tr. 73-75. The VE testified such an individual could not perform Plaintiff's past work, but could perform other jobs such as office helper, mail clerk, or checker. *See* Tr. 74-75. The VE further testified that modifying the manipulative restriction (reaching, handling, and fingering) to occasional, more than one absence per month, or being off task over ten percent of a workday would preclude employment. (Tr. 76).

ALJ Decision

In his July 25, 2019 decision, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2018, and had not engaged in substantial gainful activity since June 1, 2016, her alleged onset date. (Tr. 14). He determined she had the following severe impairments: obesity, osteoarthritis of the knee bilaterally, Osgood-Schlatter's Disease of the left lower extremity, carpal tunnel syndrome bilaterally, degenerative disc disease of the lumbar spine and the cervical spine with radiculopathy, peripheral polyneuropathy, fibromyalgia, chronic obstructive pulmonary disease, asthma, irritable bowel syndrome, depressive disorder, adjustment

disorder, anxiety disorder, and memory loss. *Id.* He concluded that none of these impairments – singly or in combination – met or medically equaled the severity of a listed impairment. (Tr. 15). The ALJ then set forth Plaintiff's RFC:

> I find that the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramps and stairs, but never climb ladders ropes or scaffolds. The claimant can occasionally stoop, kneel, crouch and crawl. The claimant can frequently balance. The claimant can frequently reach, handle and finger with the bilateral upper extremities. The claimant must avoid concentrated exposure to dusts, odors, gases, fumes, poor ventilation and other pulmonary irritants. The claimant must avoid concentrated exposure to loud and very loud noises, and very bright lights (defined as brighter than a typical office setting). The claimant must avoid all exposure to hazards such as unprotected heights and moving mechanical parts. The claimant can perform simple, routine and repetitive tasks, but cannot perform tasks at a production rate pace such as assembly line work. The claimant can respond appropriately to occasional changes in a routine work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.

(Tr. 18). The ALJ determined Plaintiff could not perform any past relevant work, but considering her age, education, work experience, and RFC, could perform other jobs that exist in significant numbers in the national economy. (Tr. 24-25). Therefore, he found Plaintiff not disabled from her alleged onset date (June 1, 2016) through the date of his decision (July 25, 2019). (Tr. 26).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("[W]hatever the meaning of "substantial" in other contexts, the threshold for such

evidentiary sufficiency is not high."). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff contends she is entitled to remand under both Sentence Four and Sentence Six of 42 U.S.C. § 405(g). For the reasons discussed below, the Court concludes neither is warranted.

<u>Sentence Four</u>

Plaintiff first argues the ALJ's decision is not supported by substantial evidence. She contends the ALJ misrepresented Plaintiff's statements, did not properly review her subjective symptom statements, cherry-picked the evidence, and failed to include sufficient manipulative limitations in the RFC.

The RFC is "the most a claimant can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). An ALJ must consider all impairments, and the RFC must be based on all relevant medical and other evidence. 20 C.F.R. §§ 404.1545(a), 416.945(a). And, of course, when determining whether substantial evidence supports an ALJ's decision, the court "do[es] not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

13

*Manipulative Limitations*

Plaintiff specifically challenges the ALJ's finding that she can frequently reach, handle, and finger objects. (Doc. 12, at 10-11). However, she cites only the VE's testimony that if this limitation were changed to "occasional", no jobs would be available. *Id.* She then argues: "There is a great deal of evidence in the case record establishing [Plaintiff's] severe limitations in using her hands. The ALJ's decision finding she can perform work frequently reaching, handling, and fingering objects is not supported by substantial evidence." *Id.* at 11. That is the entire argument. The Court can certainly find evidence in the record to support Plaintiff's argument that she is more limited. *See* Tr. 1029-30 (decreased range of motion in cervical spine, decreased sensation and strength in Plaintiff's left hand); Tr. 1031 (tenderness in left upper arm and decreased sensation and grip in left hand); Tr. 1058 (cervical spine tenderness radiating down neck to shoulders); Tr. 1243 (reduced range of motion in cervical spine, 4/5 to 5/5 motor strength in arms); *see also* Tr. 52-57 (testimony regarding hand and arm limitations). But that is not the standard.

The ALJ considered this evidence – and the rest of the record– and determined a limitation to "frequent" reaching, handling, and fingering was appropriate. *See* Tr. 24 ("The claimant's cervical radiculopathy and carpal tunnel syndrome also supported the limitations regarding reaching due to lost strength and sensation in the upper extremities.").[4] This determination is supported by substantial evidence. In contrast to the records cited above suggesting possible greater limitation, the ALJ cited numerous other records in which Plaintiff was noted to have normal upper extremity strength or in which there are no notations regarding hand or arm symptoms. *See* Tr. 19 ("No signs of reduced reflexes, strength or sensation were noted.") (citing

---

4. Social Security Ruling 83-10 defines "frequent" as "occurring from one-third to two-thirds of the time." 1993 WL 31251, at *6.

Tr. 837, 977); Tr. 20 ("However, the claimant's extremities and neck had full range of motion despite her pain. No loss of strength [or] reflexes was described.") (citing Tr. 963); Tr. 20 ("Regardless, the claimant's neck and hands had full range of motion. No swelling was observed.") (citing Tr. 1029-31); Tr. 20 ("The claimant's extremities did not present any suboptimal signs. No swelling, reduced strength, reduced reflexes or reduced sensation was noted.") (citing Tr. 938); Tr. 20 ("Furthermore, examinations performed in July 2017 did not reveal significant loss of function in the claimant's arms.") (citing Tr. 929); Tr. 20 ("Regardless, the claimant's neck and extremities had a full range of motion. There was no sign of reduced reflexes or sensation.") (citing Tr. 1062); Tr. 20-21 ("The claimant's alleged symptom [losing strength in her extremities] [was] not supported by the examination results. Her extremities exhibited no tenderness or swelling. Her strength appeared to be intact[.]") (citing 1079-80); Tr. 21 ("However, her extremities and back had full range of motion with normal reflexes and strength.") (citing Tr. 1141); Tr. 21 ("Despite her complaints, she exhibited intact physical processes. Her neck and extremities had normal range of motion. She exhibited normal muscle tone, coordination and gait.") (citing Tr. 1104).

The Court finds the ALJ fulfilled his duty to weigh the conflicting evidence in determining Plaintiff's RFC, and his decision that the record supported an ability to perform frequent reaching, handling, and fingering is supported by substantial evidence.

*Subjective Symptom Analysis*

Plaintiff's Sentence Four argument also implicates the ALJ's consideration of her subjective symptom reports. She summarizes several of her self-reported limitations and contends the ALJ misrepresented or failed to consider them. *See* Doc. 12, at 9-10.

The Sixth Circuit has recognized that pain alone may be disabling. *See King v. Heckler*, 742 F.2d 968, 972 (6th Cir. 1984). As the relevant Social Security regulations make clear, however,

a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also Walters*, 127 F.3d at 531; *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800–01 (6th Cir. 2004). Where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

When a claimant alleges impairment-related symptoms, an ALJ must follow a two-step process to evaluate those symptoms. 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p, 2017 WL 5180304, *2-8.[5] First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. SSR 16-3p, 2017 WL 5180304, *3-4. Second, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which those symptoms limit the claimant's ability to perform work-related activities. *Id.* at *3, 5-8. To evaluate a claimant's symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and

---

5. SSR 16-3p replaced SSR 96-7p and applies to decisions on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13. It directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms" and removes the term "credibility". *Id.* at *1. Both rulings, however, refer to the same two-step process articulated in 20 C.F.R. § 404.1529 and the same factors to consider. *See Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (noting that the updated ruling was to "clarify that the subjective symptoms evaluation is not an examination of an individual's character.") (internal quotation omitted). Thus, "[w]hile the court applies the new SSR, it declines to engage in verbal gymnastics to avoid the term credibility where the usage of the term is most logical." *Pettigrew v. Berryhill*, 2018 WL 3104229, at *14 n.14 (N.D. Ohio), *report and recommendation adopted*, 2018 WL 3093696.

other evidence. *Id.* at *5-8. In addition, the ALJ must consider the factors in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *Id.* at *7-8. Those include: daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c) Although the ALJ must "consider" the listed factors, there is no requirement that he discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

The Sixth Circuit has held (interpreting SSR 96-7p, the precursor ruling) a credibility determination will not be disturbed "absent compelling reason", *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and such determinations are "virtually unchallengeable", *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal quotation omitted). The Court is thus limited to determining whether the ALJ's reasons are supported by substantial evidence. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.].").

The ALJ in this case set forth the two-step process (Tr. 18), and then summarized Plaintiff's testimony and subjective reports regarding her physical symptoms:

> The claimant reported that she experienced severe pain in her knees and shoulders due to arthritis. She stated that she also experienced pain in her neck and low back that radiated into her extremities. She reported that her extremities were weak due to her degenerative neck and back conditions. She indicated that these symptoms interfered with her capacity to sit, stand, walk, lift, carry and climb stairs. She frequently dropped things and could not lift more than a gallon of milk. She could

> not stand more than twenty minute[s] at one time. In addition, the claimant testified that her bowel conditions caused frequent diarrhea and her COPD reduced her stamina due to impaired breathing. The claimant indicated that her fibromyalgia caused generalized pain and fatigue. These conditions further interfered with her ability to engage in activities.

(Tr. 19). The ALJ then applied the two-step process, finding Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms", but her statements about the "intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.*

In the three-page analysis of the record following this statement, the ALJ made numerous notations explaining he found the objective medical evidence contradicted Plaintiff's subjective reports. *See Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."). The ALJ's analysis includes the evidence summarized above regarding Plaintiff's arm and neck impairments. It further includes other notations of normal, or mild musculoskeletal findings. *See generally* Tr. 19-21; Tr. 19 ("No signs of reduced reflexes, strength or sensation were noted.") (citing Tr. 837, 977); Tr. 20 ("The treatment notes contained no indication of an impaired gait.") (citing Tr. 963); Tr. 20 ("[T]he claimant walked with a normal gait.") (citing Tr. 1062); Tr. 20-21 ("Her strength appeared to be intact and she walked with a normal gait.") (citing 1079-80); Tr. 21 ("Despite her complaints, she exhibited intact physical processes. . . . She exhibited normal muscle tone, coordination and gait.") (citing Tr. 1104); Tr. 21 ("Nevertheless, the claimant was able to walk unassisted and could walk on her toes and heels. She produced negative straight leg raise tests bilaterally. She had 5/5 strength in her lower extremities.") (citing Tr. 1241-43, 1277-79).

18

This analysis further contained numerous notations regarding unremarkable pulmonary and abdominal examinations, undermining Plaintiff's subjective statements that she was more limited by her COPD and IBS. *See* Tr. 19-21. This is also a supported rationale. *See* Tr. 786, 929, 935, 953, 967, 977, 1062, 1071, 1080, 1104) (normal abdominal examinations); Tr. 935, 938, 944, 953, 963, 977, 1071, 1080, 1104, 1141, 1147) (normal pulmonary examinations); *see also* Tr. 1074-75 ("COPD has been fairly well controlled on her current medication" and a "history of abdominal pain and cramping that improves with medication"). Moreover, the ALJ added a restriction to the RFC to accommodate COPD-related restrictions. *See* Tr. 18 ("The claimant must avoid concentrated exposure to dusts, odors, gases, fumes, poor ventilation and other pulmonary irritants."); *see also* Tr. 22 (finding state agency physician opinions unpersuasive because they, *inter alia*, "failed to account for limitations caused by the claimant's COPD").

And, contrary to Plaintiff's argument that the ALJ cherry-picked the record, focusing only on the evidence that supported his non-disability finding, the ALJ also acknowledged and cited contrary findings. *See* Tr. 19 ("[T]he claimant's extremities were diffusely tender and swollen with both knees exhibiting the most severe tenderness.") (citing Tr. 967, 977); Tr. 20 ("An examination found that claimant's knees were tender and positive for crepitus with movement."); Tr. 20 ("[H]er knees and cervical spine were both tender. She exhibited reduced strength and reduced sensation in her left hand.") (citing Tr. 953); Tr. 20 ("[T]he claimant['s] neck was tender to palpation with pain radiating into her shoulders.") (citing Tr. 1062); Tr. 21 ("[T]he claimant was tender in eighteen of eighteen tender points.") (citing Tr. 1141) ("[T]he claimant's thoracic spine and lumbar spine were tender to palpation. She walked with an antalgic gait and could not tandem walk. Her lumbar spine had limited range of motion and her left leg had reduced sensation from L4 through S1 . . . The claimant's neck had reduced range of motion. Her upper extremities exhibited mild[ly]

reduced strength and sensation bilaterally.") (citing Tr. 1241-43); *see also* Tr. 16 ("While several examinations noted reduced upper extremity strength, numerous treatment records stated that the claimant had full range of motion and intact strength in all extremities.") (internal citations omitted). The ALJ reasonably weighed these records again the rest of the record and further reduced Plaintiff's RFC from that opined by the State agency physician opinions due to her "generalize[d] muscle and joint pain, combined with . . . neck and back pain", as well as her cervical radiculopathy (Tr. 22) – adding restrictions to occasionally climbing ramps and stairs and greater postural restrictions (Tr. 18).

Plaintiff specifically argues, "at T.24 the ALJ claims she gardens, hikes, prepares meals, washes dishes, and cleans house" and this is not an accurate representation of what she reported in her function report or testified to at the hearing. (Doc. 12, at 9-10). On the page cited, after his analysis of all of the medical records, the ALJ stated:

> Finally, the claimant's daily activities were inconsistent with the alleged severity of her symptoms. Despite her complaints of asthma and COPD, the claimant continued to smoke. She reported that she was able to garden and hike on occasion even with her reported pain symptoms and reduced upper extremity strength. She managed her own funds and her own healthcare. The claimant prepared meals, washed dishes, cleaned her home and drove. The claimant reported that she helped care for her grandchild for a short period. She also had pets. (Testimony; 5E; 10F; 11F; 17F).

(Tr. 24). Plaintiff indeed testified she had limitations in her ability to do some of the activities listed. However, the ALJ's analysis finds support in the record. *See* Tr. 920 (self-reported hobbies were, *inter alia*, "gardening, and hiking as she is physically able"; she "makes the bed and cleans up", "spends time with the three dogs", cooks "[o]ccasionally", "does her own laundry" and "attends to person hygiene tasks on a fairly regular basis"); Tr. 44 (Plaintiff's testimony that she drove the twenty-five minutes to the hearing). An ALJ can consider a claimant's activities of daily living when assessing symptoms. *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir.

2014) ("Although the ability to do household chores is not direct evidence of an ability to do gainful work, see 20 C.F.R. § 404.1572, '[a]n ALJ may . . . consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.'") (quoting *Walters*, 127 F.3d at 532. That is what the ALJ did here—he used Plaintiff's basic activities of daily living to partially discount her testimony regarding the level of severity of her symptoms. To the extent Plaintiff's testimony and other evidence of record were contradictory, the ALJ reasonably resolved such conflicts.

As noted above, even if evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. As the Sixth Circuit explained:

> Both claims are reducible to an allegation that DeLong levied against the ALJ below—"cherry picking" the record. The District Court observed that this allegation is seldom successful because crediting it would require a court to re-weigh record evidence. It is no more availing on appeal. *Cf. White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.").

*DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014). The ALJ here thoroughly evaluated the record as a whole and his subjective symptom determination is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030; *see also Biestek*, 139 S. Ct. at 1154 ("[W]hatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high.").

Further, as the ALJ summarized at the end of his analysis:

> As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent with the record. The record demonstrated that the claimant had a number of physical and mental impairments. Nevertheless, the record did not demonstrate that the claimant's impairments limited her work capacity as severely as she claimed. Despite having degenerative changes to her neck and back, degenerative knee changes, carpal tunnel syndrome

21

and neuropathy, the claimant had 5/5 strength throughout the majority of the alleged period of disability. In late 2019, she had only mildly reduced upper extremity strength. The claimant's lower extremities retained their strength and she was able to walk unaided. While the claimant was treated for COPD and asthma, the claimant regularly had lungs clear to auscultation, without wheezes rales or rhonchi . . . The claimant's complaints of gastrointestinal distress were not persistent and her abdomen exhibited periods where it was non-tender and non-distended.

(Tr. 23). When faced with a record containing contradictory evidence, it is the duty of the ALJ to resolve these conflicts, not this Court. *See Bass*, 499 F.3d at 509. The ALJ reasonably did so here. The Court finds the ALJ's evaluation of Plaintiff's subjectively-reported symptoms supported by substantial evidence.

*Other Arguments*

Plaintiff also presents several undeveloped arguments regarding the ALJ's RFC determination. She contends the ALJ's decision "leaves out several very severe [medically determinable impairments] well-documented in the case record, including chronic pain syndrome", "[i]mpairment of maintaining attention and concentration", and "interstitial cystitis, urinary-frequency syndrome." (Doc. 12, at 4-5). The Court could find these arguments waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Even so, Plaintiff had not showed reversal is required.

At Step Two, the ALJ explained Plaintiff "[w]as able to engage in activities that required intact concentration", such as watching television, listening to music, reading and using the computer". (Tr. 17). Further, as to Plaintiff's attention and concentration limitations, the RFC contains several relevant limitations, including to simple, routine, and repetitive tasks, not at a production-rate pace, and occasional workplace changes. (Tr. 18). He further explained, at Step Four, Plaintiff's "depression and anxiety interfered with her memory and concentration as well as reduced her stress tolerance" and he had thus limited "work complexity, work pace, [and]

22

workplace changes". (Tr. 24). Plaintiff has not explained how these restrictions were not sufficient to accommodate her concentration limitations, and as such, she has not shown reversible error. The same is true as to Plaintiff's urinary frequency issues. Again, she does not present a developed argument – she simply states the ALJ failed to consider "[i]nterstitial cystitis, urinary-frequency syndrome", citing two medical records. (Doc. 12, at 5) (citing Tr. 1202, 1257). The first cited page is a list of current medications from a September 2017 urology visit. *See* Tr. 1202. Two pages later, the urologist diagnosed urgency-frequency syndrome and recommended surgery. (Tr. 1204). Plaintiff testified she had surgery for this condition in 2018 and might require another. (Tr. 70). The second cited page is the first page of the June 2019 cervical spine MRI and it is unclear how Plaintiff alleges this relates to her urinary issues. *See* Tr. 1257. Again, Plaintiff has failed to show reversible error in that she had any specific limitation the ALJ failed to include in the RFC.

Sentence Six

Next, Plaintiff requests this Court remand her case pursuant to Sentence Six of 42 U.S.C. § 405(g). She submits records related to two surgeries after the ALJ's decision. *See* Doc. 12-1 (August 2019 hospital and rehabilitation records), Doc. 12-2 (September 2019 hospital and rehabilitation records).[6]

---

6. Plaintiff also submitted these records to the Appeals Council, which refused to consider them evidence, stating:

> You submitted medical evidence from Summa Vibra Rehab Hospital for the period of August 24, 2019 through September 30, 2019 (246 pages). The Administrative Law Judge decided your case through July 25, 2019. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before July 25, 2019.

(Tr. 2). But this Court's task is not to review the Appeals Council's decision or rationale when evaluating a Sentence Six remand request. Rather, the Court must determine whether Plaintiff has shown the requirements for Sentence Six – described above – are satisfied.

A "Sentence Six" remand is a remand to consider additional evidence. *See* 42 U.S.C. § 405(g) ("The court . . . may at any time order additional evidence to be taken before the Commissioner . . ., but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . ."). To obtain a remand, thus, the claimant must show the evidence is "new," "material," and have "good cause" for failure to present it at the hearing. *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). Evidence is "new" if it was not in existence or available to the claimant at the time of the administrative proceeding. *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). Evidence is "material" if "there was a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir. 2012). The claimant bears the burden of showing a remand is appropriate. *See Foster*, 279 F.3d at 357; *Ferguson*, 628 F.3d at 276.

The Commissioner contends, *inter alia*, the evidence is not material because it is "essentially duplicative of the medical evidence considered by the ALJ." (Doc. 16, at 12). The Court agrees. Plaintiff has not demonstrated a reasonable probability consideration of this evidence would change the outcome here. The ALJ had before him evidence Plaintiff's physician intended to perform the surgery in the near future. *See* Tr. 30-42, 55 (hearing testimony regarding recommended surgery); *see also* Tr. 1250 (Dr. Inkrott's June 2019 note stating surgery scheduled

24

for August). And the ALJ had the MRI evidence upon which Plaintiff relies. *See* Tr. 21 (citing Tr. 1258-59). As discussed above, the ALJ undertook an exhaustive review of the medical evidence in this case and reasonably resolved conflicts therein in reaching an RFC determination.

Plaintiff contends these surgeries "confirm the severity of [her] spinal [medically determinable impairments] and the disabling nature of those impairments." (Doc. 12, at 9). In Reply, she cites two cases in which courts granted Sentence Six remands based on evidence of spinal surgery after an ALJ decision. *See* Doc. 17, at 2-3 (citing *Malec v. Colvin*, 2014 WL 66493 (N.D. Ohio); *Williams v. Commissioner of Social Security*, 2011 WL 4599625 (E.D. Mich.)). These cases are distinguishable. In *Malec*, the court found evidence of a subsequent surgery justified a Sentence Six remand where records showed operative findings were worse than predicted by pre-surgical imaging. 2014 WL 66493, at *8. Plaintiff points to no such findings in this case, and rather, by her own argument, describes the surgery "confirm[ing] the severity" of her impairment. (Doc. 12, at 9). In *Williams*, Plaintiff's spinal condition was diagnosed by a surgery after the ALJ decision, but she "complained of symptoms consistent with the conditions that were later diagnosed" during the hearing before the ALJ. 2011 WL 4599625, at *4. Again, Plaintiff points to no such new diagnosis resulting from this later-submitted evidence.

The Court finds Plaintiff has not satisfied her burden to show the new records are "material". The fact that Plaintiff went through with a planned surgery is essentially cumulative of the evidence the ALJ considered. Plaintiff's request for a Sentence Six remand is therefore denied.

**CONCLUSION**

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB and SSI supported by substantial evidence and affirms that decision.

*s/ James R. Knepp II*
UNITED STATES DISTRICT JUDGE